

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00293-CV

| | | |
|---|---|---|
| In the Interest of C.J.G. | § | From the 323rd District Court |
| | § | of Tarrant County (323-93811J-10) |
| | § | January 4, 2013 |
| | § | Opinion by Justice Dauphinot |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Lee Ann Dauphinot



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-12-00293-CV

IN THE INTEREST OF C.J.G.

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

After a bench trial, the trial court terminated the parental rights of Appellant J.R. to his two-year-old son, C.J.G. In four issues, J.R. contends that the evidence is legally and factually insufficient to support the trial court's judgment. Because we hold that the evidence is legally and factually sufficient to support termination, we affirm the trial court's judgment.

---

[1]*See* Tex. R. App. P. 47.4.

**Statement of Facts**

In December 2010, the Texas Department of Family and Protective Services (TDFPS) removed C.J.G., who was less than two months old, from his mother, who is not a party to this appeal, on the bases of neglect and her repeated statements that she wanted to give him up.

On February 29, 2012, the trial court entered an order for actions necessary for J.R. to obtain the return of the child. The order provides,

IT IS ORDERED that [J.R.] comply with the following:

. . . .

3. [J.R.] will complete a psychological evaluation with Dr. Nichelle Wiggins . . . .

4. [J.R.] will follow any and all recommendations of his psychological evaluation with Dr. Nichelle Wiggins . . . [.]

5. [J.R.] will obtain and maintain appropriate housing for himself and [C.J.G].

6. Within ten (10) days of this agreement, [J.R.] will provide CPS written documentation of said housing, i.e.[,] a lease or similar documentation that lists him as an occupant.

7. [J.R.] will obtain gainful employment.

8. Within ten (10) days of obtaining gainful employment, [J.R.] will provide CPS written documentation of said employment.

9. If employed, by the fifth day of each month, [J.R.] will provide to CPS copies of [his] paystubs from the previous month.

10. If [J.R.] is unable to obtain gainful employment, [he] will provide CPS written documentation of sources of income with which he will provide food, shelter, clothing and basic necessities for himself and [C.J.G].

3

11. [J.R.] will maintain weekly contact with Case Worker Tyra Sasita [by mail or telephone] and/or via e-mail . . . to provide service plan progress updates.

At trial, J.R. testified that he is twenty-six years old and lives with his mother at an apartment complex in Arlington; that he does not know how much the rent is; that he does not drive, know how to drive, or have a driver's license; that his eyeglasses were broken in a fight a long time ago; and that he has not worn eyeglasses since that time. J.R. testified that he had never had a job but had completed a job program where he learned to stack things on shelves. He had not applied for any jobs.

J.R. testified that he receives periodic disability checks. He did not know the amount of each check. He explained that his guardian, who is not his mother, is the payee for his disability checks. He testified that he is paid twice a month, and he was not sure but believed that he receives $60 on one pay date and $40 on the other. He further testified that he had never lived by himself and does not have a bank account. He testified, however, that he does know how to write a check because he had learned in school.

He also testified that he passed all his classes in school but did not receive a high school diploma because he was "[s]low in classes and stuff like that." But he further testified that he learned to cook and can "make everything." Additionally, he testified that he does his own laundry.

J.R. testified that he had not been diagnosed with a mental illness or deficiency or, to his knowledge, mental retardation; he was able to define the

4

term "mental retardation" for the trial court. He also testified that he has epilepsy and takes medication for that condition. He stated that he can see with and without his eyeglasses. We note that an MHMR record provides that J.R. "is considered to be legally blind in his right eye with substantially poor vision in his left eye."

J.R. testified that he is C.J.G.'s father and that DNA testing confirmed his status as the baby's father. He could not remember which hospital the baby was born in but did remember being at the hospital, and he stated that C.J.G. weighed "six or seven or eight ounces, something like that" at his birth. J.R. testified that C.J.G. and his birth mother lived a short time with J.R. after leaving the hospital. J.R. additionally testified that the birth mother neglected C.J.G. but that he sanitized bottles and fed the baby. But J.R. also testified that even though the birth mother was neglecting C.J.G., he did not stop her from moving out of his apartment with C.J.G.

When asked how much money he would need each month to take care of C.J.G. if C.J.G. were placed in his care, J.R. said, "I'd say about—I don't know. It costs a lot of money to take care of a little baby," and "[l]ike a hundred to like 200." J.R. said he would spend the money on clothes, diapers, and bathing supplies for the baby. J.R. did not know what size shoes or clothes C.J.G. wore or what medication he was on at the time of trial but also testified that "they" had not told him that information.

5

J.R. additionally testified that a person's normal temperature is "about 150" but that a person with a fever would have a temperature "[b]elow 90."

When asked if C.J.G. was slow, J.R. testified that the baby was "kind of like [J.R.]" but also "very active." J.R. knew of no special doctors that C.J.G. saw but was aware that he went to a special place that provided help for babies, help which J.R. thought was psychiatric. J.R. testified that if he gained custody, he would take C.J.G. wherever he needed to go. But he admitted that he would have to depend on family members for transportation.

J.R. could not initially remember C.J.G.'s birth date or year but knew that he was a year old and walking and talking. When asked what he would feed C.J.G. if he were taking care of him, J.R. replied that he would feed the child Ritz crackers and "[f]ood and stuff like that." When asked what he would do if C.J.G. were returned to him that day, J.R. stated that he would "probably" need to "get a ride" and a job. He admitted that he had no money saved.

When asked if he "remember[ed] being in court and a judge order[ing] [him] to do some stuff for [him] to be able to get [C.J.G.] back," J.R. answered, "Yes." He testified that he saw the caseworker, Tyra Sasita, most Mondays and that his visits with C.J.G. were on Mondays. But he also testified that he had problems getting to the visits at all or on time because he did not "get rides most of the time."

J.R. admitted that he had been ordered to have a psychological evaluation completed by Dr. Nichelle Wiggins. When asked whether he had complied with

6

that order and whether Sasita had asked him to get a psychological evaluation from Wiggins a couple of times, J.R. excused his noncompliance because he lacked transportation. When asked whether he refused to participate in a psychological evaluation with Wiggins on the date that he actually went to her office, J.R. testified that he just did not understand the questions she asked. He also testified that he refused to sign paperwork for her.

J.R. also admitted that he had not provided paperwork regarding his apartment lease or disability payments to Sasita.

J.R. recognized that C.J.G. and his clothes were clean on visits and that the foster parents sent snacks and toys to the visits.

J.R. testified that his mother was not at trial because she had been sick. He also testified that if his mother could not live with him, he would live with his sister, but he admitted that he had been told that the same sister could not have custody of C.J.G. because of her background and that CPS had rejected his brother as a potential placement as well.

J.R. did not return after the first day of trial to complete his testimony.

Wiggins testified that she reviewed an MHMR psychologist's report providing that J.R. had been diagnosed with mild mental retardation. The report also noted that he had epilepsy and visual impairment. Further, he scored a 48 on the global adaptive functioning scale, which she described as moderate-functioning.

Wiggins testified that she never formally evaluated J.R. He missed several appointments and then finally arrived for an appointment late. Wiggins testified:

> [J.R.] arrived 30 minutes late. He did not present with any identification. When asked could he write down his demographic information such as name, date of birth, Social Security number, he became nervous and said he could not do that and basically he said he wanted to go back home and get his identification and get his mother to come back with him. I said that would be fine, even though we would be starting later than usual, and so he left and then he came back around 12:10—and the appointment was originally scheduled for 9:30—he returned around 12:10, and basically he was alone—he didn't have his mother at that time—he refused to sign any paperwork, he did have his identification, but he basically said he was not willing to do any part of the evaluation, even though it was court-ordered.

Based on that day in her office and her observations of him in court, Wiggins opined,

> Overall, I would agree and I would endorse the findings that he does present as a person who has limited cognitive skills. He has very limited comprehension. His ability to recall specific information that is important in parenting, such as just being able to get his child's date of birth accurately, is diminished.
>
> He presents as a person who has mild mental retardation, and those findings seem to be appropriate to what I was able to observe.

Wiggins also stated that she would have serious concerns about J.R. being the primary caregiver of a one-year-old child and that his mild mental retardation, coupled with his other health issues, "could" affect his ability to parent independently and to provide for the physical, emotional, and mental needs of the child.

8

The child's ad litem attorney asked Wiggins why she used the conditional word "could" instead of "would." Wiggins answered,

> Well, the literature and my own experience, because I used to work with MHMR clients and do the determinations of mental retardation, and I've interacted quite extensively with MR clients, there are some parents that can parent effectively and they have mental retardation, but there is a lot of support in place for them. They've been able to achieve the highest level possible at their range of mental retardation, which some people can get up to sixth or seventh-grade reading level, so it depends on the individual. It depends on their educational exposure, the type of environment in their home; it depends on the type of support that they have at the time they have the child and how they respond to the interventions that are offered.

The ad litem attorney then asked if J.R. had reached a level of "intellectual attainment and that level of other things necessary to where he could take care of [C.J.G.] for the rest of his life[.]" Wiggins answered,

> Based on observation of him and the information that I was able to gather, I would say no. He's never held a job. You look at one's adaptive skill. He's never been able to hold a job, no vocational skills, he didn't even know what his monthly income was from SSI, he had no ideas about budgeting, he wasn't able to demonstrate an understanding of safety issues like what's the normal body temperature for a person when that question was asked of him. He gave a very erroneous answer, so basically, just watching him and listening to him and reading about his findings, I was able to conclude that he really has not reached a very high level for someone who has mild mental retardation.

Wiggins also testified that J.R. had not demonstrated any independent living skills.

But she admitted the possibility that J.R. could parent with help. Specifically, Wiggins admitted that services available through MHMR, the

9

Association of Retarded Citizens (ARC), and Volunteers of America could help J.R. with his parenting skills, but she testified that his history of frequently starting and stopping MHMR services was a major concern. She admitted that she had no idea whether J.R. had participated in or knew of these services because "he refused to go through the evaluation and assessment process with [her]." She testified that in refusing treatment,

> He just said he was not going to do it and his mother thought it was not best for him to do it and he was just going to refuse, and he said there was no way no chance he would come back for the evaluation, no matter what they said to him.

Wiggins testified that J.R.'s lack of family support, as demonstrated by their absence from trial, including the absence of any telephone calls from his family explaining his absence on the second day of trial, would be a significant factor in his ability to respond to emergencies and the needs of C.J.G.

When answering a hypothetical question regarding a mentally retarded parent's failure to fulfill court-ordered requirements and cause for concern regarding his engaging in services in the future, Wiggins answered,

> . . . . Hypothetically speaking, whether a person has mental retardation or they don't have mental retardation, really it should be based upon the individual and whether or not they were able to successfully complete those required components to demonstrate they can parent effectively, so even if you take away the fact that he has mental retardation, you're looking at the individual and holding him to the same standards as everyone else, I would say I would have serious concerns, because you could have people with average intelligence and they fail to follow through. They fail to be able to demonstrate that they can handle those types of requirements effectively, so just looking at him as a person, yes, I would have concerns if he's not reliable, he's not responsible, he

10

fails to follow through, and he hasn't been able to demonstrate that he can . . . parent effectively.

On cross-examination by J.R's counsel, Wiggins did identify some of J.R.'s accomplishments:

> [B]asically, [J.R.] has been able to get a state-issued identification card, which I thought good. Even though he arrived late for an appointment, he still showed up and he expressed why he didn't want to go through the assessment and he was willing to sign off saying he declined services.
>
> He has followed through with MHMR to go through an evaluation with the assistance of his mother being with him based on the report.
>
> He was able to recall one of the medications he took, even though he couldn't recall the other two.
>
> He was able to . . . the best of his ability answer questions. Even though he had diminished comprehension, he tried, and even though he became nervous and a little frustrated at times, there was no outward display of aggression or ever any outward displays of an emotional disturbance, so those are positive things for him,

but she also stated that she observed "a lot more deficits" than positives.

Wiggins admitted that "[J.R.] was able to give some accurate answers, which is not unusual with people with mild mental retardation. They may be able to answer some things correctly and then some things they just don't have a clue about." As an example, she pointed out that he had known that the birth mother was neglecting C.J.G., but

> he didn't know how to report that.
>
> The question was asked of him what could he have done differently, and he really didn't have a comprehension answer for that. He really didn't know how to protect the child. He was aware

11

something wasn't right, but he didn't know what steps to take to protect the child and keep the child out of harm's way.

Wiggins explained that J.R. is "functioning like an eight-year-old person based upon the test results, and so an eight-year-old person may know right from wrong, a person at that mental level, but they may not know the next steps or the next logical problem-solving interventions to take."

Tyra Sasita testified that she is the TDFPS conservatorship worker for this case. She testified that she developed a service plan for J.R. and that the trial court also ordered that he complete certain services to have C.J.G. returned to his care. She testified that he failed to complete a psychological evaluation with Wiggins and that this failure was significant because TDFPS needed to obtain his functioning level and wanted a second opinion to compare to the MHMR evaluation. We note that Wiggins relied on the functioning level—eight-year-old—provided by the MHMR report and testified that because of the standardization of the testing, if she had performed the evaluation, the number would not have "var[ied] very much."

Sasita also testified that she wanted J.R. evaluated because of the level of functioning he showed during visits with C.J.G. J.R. could not change the child's diapers, could not calm or soothe the baby, and became very nervous when he was with the child, so nervous that Sasita could see him shake. Sasita further stated that J.R. would hold C.J.G. so long that the child would become uncomfortable and want to spend the majority of the visit with the case aide.

12

Sasita additionally testified that J.R. would not play with C.J.G. at the visit or feed him: "[J.R.] has to be prompted to do everything."

On cross-examination she identified other major concerns:

> The ability to play with him or to even pick up on the cues that [C.J.G.] doesn't want to be held. He's walking now. He wants to walk, he wants to play, he wants to explore. But he doesn't get those cues. When [C.J.G.] becomes whiny, he gets a little agitated, so that's when [J.R.] has to be prompted because he will continue to hold [C.J.G.] through that, and so that [C.J.G. and J.R.] can feel comfortable, someone will say, you know, [J.R.], why don't you try putting him down? Or here's a toy. Try to get him to play with this train or here are his cookies in his bag, here is some juice, but those things you have to tell him.

Sasita further testified that J.R. had once told her that he thought C.J.G. would walk and talk when he was about seven years old.

Sasita additionally testified that J.R. failed to follow more of the trial court's directives. Because he did not comply with the requirement to submit to a psychological evaluation by Wiggins, J.R. necessarily did not comply with the trial court's order to follow through with any and all of her recommendations. Nor did he comply with the trial court's order to obtain and maintain appropriate housing for himself and C.J.G. Sasita explained that when she visited the apartment J.R. shares with his mother,

> It was a two-bedroom apartment. When [Sasita] arrived, [J.R.] and a friend were sleeping in the living room on an air mattress. His mother was in one of the bedrooms. She was asleep and there was a room that was just locked. There was a padlock on that room, and she did open the door for [Sasita], and there were just like storage areas there. Furniture was very, very minimal. The kitchen did have food. There was a television there, but there was nothing there for a baby.

13

Sasita also testified that J.R. failed to comply with the trial court's orders that he provide written documentation of his housing and that he obtain gainful employment and provide documentation (including pay stubs) thereof. She further testified that J.R. failed to comply with the alternate order that he provide written documentation of sources of income with which he would pay for food, shelter, clothing, and basic necessities for himself and C.J.G. Sasita testified that she had asked J.R. how much his monthly disability check was but that he had replied that his mother handles it, and his mother would not tell Sasita the amount of the check. Sasita verified that J.R. receives disability benefits but was unable to verify the amount.

Sasita further testified that she and J.R. do not have direct communication because it makes him nervous, so she speaks to him through the case aide if there is an emergency.

Sasita also testified that J.R.'s mother had told her that she does not believe that J.R. can parent independently and that she plans to help him, but she attended very few visits with C.J.G. J.R.'s mother also did not attend trial.

Sasita further testified that J.R.'s visits with C.J.G. have been very sporadic and that transportation has been an issue for him. She admitted that she believed that he had attempted to attend all scheduled visits with C.J.G., but she also testified that several visits did not occur because he did not come or because he was late. She stated that he did not follow through with her

14

suggestion that he get help from MHMR with transportation; instead, he depended on his family.

Sasita testified that she would not favor placement of C.J.G. with J.R. in the home with his mother so that she could help with her grandson because

> [a]t this point his mom has not shown that she can be a caregiver. One main concern is she does not have employment. She will not talk about how she lives from day to day. [Sasita believes] that [J.R.'s mother is using] some of [J.R.'s] money [to] hous[e] herself.
>
> She has some medical concerns, she has some criminal history, and she didn't raise [J.R.] herself. [J.R.] was primarily raised by his grandmother. It's only been since he's an adult that he's lived with his mother consistently.

Sasita further testified that C.J.G. is in a dual-licensed adoption-motivated placement. He has been in that foster home for a signficant period of time and, to Sasita, acts as if the foster family is his family; she testified that he "has adjusted very well." Sasita had no concerns that an adoption by the current placement would be delayed should the trial court terminate the parents' rights.

Sasita testified that C.J.G. will require a lot of medical attention, but she did not know how long he would need medical care. Physically, there have been concerns about C.J.G.'s eye. He wore patches for some time, and several MRIs were performed. She also reported that he had had some issues with eating and drinking but that therapists had worked with him, and he had made progress. Finally, she also stated that he is somewhat developmentally delayed—his speech is not at the level it should be and "[he has] some other little motor skills

15

issues"—but overall, "he's doing okay." Sasita doubted that J.R. could ensure that C.J.G.'s medical needs were met.

Sasita also testified that there was no bond between J.R. and C.J.G. and that J.R. had never asked her about C.J.G., how he was doing, or what services were being provided; J.R. had asked her nothing about the child's wellbeing.

After the trial, the trial court signed an order terminating the parents' rights to C.J.G. Among other findings, the trial court found that J.R.

> failed to comply with the provisions of a court order that specifically established the actions necessary for [him] to obtain the return of [C.J.G.,] who has been in the permanent or temporary managing conservatorship of [TDFPS] for not less than nine months as a result of [C.J.G.'s] removal from the parent under Chapter 262 for abuse or neglect[,]

and also found that "termination of the parent-child relationship, if any exists or could exist, between [J.R.] and [C.J.G.] is in [C.J.G.'s] best interest."[2]  In his second and fourth issues, J.R. contends that the evidence is legally and factually insufficient to support these two findings.

**Legal and Factual Sufficiency of the Evidence to Support Termination**

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child.[3]  Both elements must be established; termination

---

[2]*See* Tex. Fam. Code Ann. § 161.001(1)(O), (2) (West Supp. 2012).

[3]*Id.* § 161.001; *In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005).

16

may not be based solely on the best interest of the child as determined by the trier of fact.[4]

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven.[5] In this case, we determine whether the evidence is such that the trial court could reasonably form a firm belief or conviction that (1) J.R. failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of C.J.G. and (2) termination of J.R.'s parental rights is in C.J.G.'s best interest.[6]

We review all the evidence in the light most favorable to the finding and judgment.[7] We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so.[8] We disregard all evidence that a reasonable factfinder could have disbelieved.[9] We consider undisputed evidence even if it is

---

[4]*Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

[5]*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

[6]*See* Tex. Fam. Code Ann. § 161.001(1)(O), (2).

[7]*J.P.B.*, 180 S.W.3d at 573.

[8]*Id.*

[9]*Id.*

contrary to the finding.[10]  That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.[11]

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province.[12]  And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.[13]

In reviewing the evidence for factual sufficiency, we give due deference to the trial court's findings and do not supplant the judgment with our own.[14]  We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that J.R. violated subsection (O) of section 161.001(1) and that termination of the parent-child relationship would be in the best interest of C.J.G.[15]  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a

---

[10] *Id.*

[11] *Id.*

[12] *Id.* at 573, 574.

[13] *Id.* at 573.

[14] *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

[15] *See* Tex. Fam. Code Ann. § 161.001(1)(O), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[16]

Further, there is a strong presumption that keeping a child with a parent is in the child's best interest.[17] Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.[18] The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

---

[16]*H.R.M.*, 209 S.W.3d at 108.

[17]*In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

[18]Tex. Fam. Code Ann. § 263.307(a) (West 2008).

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

      (A) minimally adequate health and nutritional care;

      (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

      (C) guidance and supervision consistent with the child's safety;

      (D) a safe physical home environment;

      (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

      (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.[19]

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

---

[19] *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.[20]

These factors are not exhaustive; some listed factors may be inapplicable to some cases.[21] Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.[22] On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[23]

The evidence shows that J.R. did not comply with several portions of the trial court's February 2012 order. J.R. refused to allow Wiggins to perform a psychological evaluation and did not provide information to TDFPS from which it

---

[20] *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

[21] *C.H.*, 89 S.W.3d at 27.

[22] *Id.*

[23] *Id.*

could determine that he could provide for C.J.G.'s basic needs or heightened medical needs. Looking at the evidence in a favorable light to the finding as well as with merely appropriate deference to the finding, we hold that the trial court could have formed a firm belief or conviction that J.R. violated its order providing steps necessary for J.R. to take to secure the return of his child. We therefore hold that the evidence is legally and factually sufficient to support the trial court's finding regarding subsection (O) of section 161.001(1).[24] We overrule J.R.'s second issue.

Similarly, though J.R.'s testimony shows his concern and affection for C.J.G., the evidence taken as a whole demonstrates that J.R. does not have the requisite skill set or support system to shoulder the responsibility of raising C.J.G. and providing for his needs. The evidence further shows that C.J.G. is in a home with foster parents who would like the home to be permanent, that he has lived there quite a while and has adjusted well, and that developmentally, he continues to improve and is "okay." Thus, reviewing the evidence in a light favorable to the best interest finding as well as in a merely deferential light, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of J.R.'s parental rights is in C.J.G.'s best interest.[25] We therefore hold that the evidence is legally and factually sufficient to support the trial court's best interest

---

[24]*See* Tex. Fam. Code Ann. § 161.001(1)(O).

[25]*See id.* § 161.001(2).

finding against J.R.  We overrule J.R's fourth issue.  Having overruled J.R.'s second and fourth issues, we do not reach his remaining issues.[26]

**Conclusion**

Having overruled J.R.'s dispositive issues, we affirm the trial court's judgment terminating his parental rights to C.J.G.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: January 4, 2013

---

[26] *See* Tex. R. App. P. 47.1.